The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Chapman. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award, except with the modification of Finding of Fact 9, Conclusion of Law 4, and Award paragraph 2.
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
STIPULATIONS
1. Defendants continued to pay compensation to plaintiff to the date of hearing.
In addition, the parties stipulated into evidence the following:
1. Notebook containing medical records and reports.
2. Four pages of correspondence between counsel regarding the biofeedback issue.
* * * * * * * * * * *
The Full Commission adopts the findings of fact found by the Deputy Commissioner and finds as follows:
FINDINGS OF FACT
1. Plaintiff is 52 years old and is a high school graduate. He had a year and one-half of college before being drafted into the Armed Forces were he served as a paratrooper and as a mechanic. After his military discharge, he worked for a number of years as an employee before starting a car cleaning business. He later got into the janitorial business and was the owner of defendant-employer, a company which performed both commercial and residential cleaning services in Oxford and in Raleigh. In subsequent years he added floor refinishing, blind cleaning and limousine service to his various enterprises.
2. In addition to the supervisory work associated with operating the janitorial service, plaintiff also performed some of the physical labor. The most difficult task was operating the machine which sanded floors.
3. On April 30, 1991 plaintiff was driving in Greensboro on company business when another vehicle abruptly turned right from the left turn lane and struck his vehicle. As a result of the accident, he sustained injuries to his right knee, his left elbow and his upper back. He thereby sustained an injury by accident arising out of and in the course of his employment. He did not seek medical treatment immediately but went to Dr. Chavis, his family doctor, the next day. She referred him to Dr. Somers for treatment of his knee problem and to Dr. Kihlstrom for treatment of his back condition. On May 16 he saw both doctors.
4. Dr. Somers diagnosed plaintiff with patellar tendonitis of the right knee and olecranon bursitis of the left elbow, and he treated plaintiff conservatively with medication and physical therapy. Dr. Kihlstrom initially diagnosed plaintiff with a cervical flexion/extension type of injury and he also recommended conservative treatment. Plaintiff continued to complain of multiple problems, and in August Dr. Kihlstrom ordered an MRI which showed mild spondylitic disease but no focal disc herniation. Dr. Kihlstrom also referred him to Dr. Goetzl, a neurologist, to rule out a neurological disease process. Plaintiff's condition was subsequently diagnosed as dorsal myofascial syndrome, and he was referred to Southwind Spine Rehabilitation Center for a comprehensive rehabilitation and therapy program.
5. Plaintiff underwent the program at Southwind in December 1991 and January 1992, however he was less than entirely compliant as he had been with previous physical therapy programs. He would not use the exercise and icing techniques they taught him at home in order to manage his pain, he would not learn the lifting techniques they attempted to show him and he ultimately began to miss sessions. Nevertheless, by the time of his discharge, his condition had improved to the point that a functional capacity evaluation revealed that he could perform medium level work.
6. On January 30, 1992 Dr. Kihlstrom released plaintiff to return to work within the restrictions of the functional capacity evaluation. Plaintiff indicated that he could not return to work for his company since he was not able to train new employees or perform the heavy work. His wife was managing its operation at that time. Consequently, the insurance carrier, which had admitted liability for this claim, hired James Seitz, a vocational consultant, to assist plaintiff in looking for alternative employment.
7. Plaintiff was continuing to complain of problems with his knee which he indicated had worsened during therapy. After further conservative measures did not provide relief, Dr. Somers recommended surgery. On March 25, 1992 plaintiff underwent a patellar bursectomy and plica excision. He subsequently underwent physical therapy to rehabilitate his knee.
8. In May 1992 plaintiff returned to Dr. Goetzl regarding his continuing complaints of neck and shoulder pain. There was still no evidence of underlying neurologic lesion and Dr. Goetzl did not recommend further treatment. He advised plaintiff to "get on with his life" and to return to work with limitations on lifting, bending and stooping.
9. Mr. Seitz worked with plaintiff during the time he was recovering from knee surgery. Plaintiff's aptitudes and interests were identified, a resume was prepared and a labor market survey was performed. He was also given instructions on job seeking skills and leads for job openings. He was asked to keep a log of his contacts. His efforts to contact potential employers were sporadic at best, and he usually did not document contacts as instructed. Mr. Seitz continued to encourage and push him but it became apparent that he did not want to look for work.
10. Although both Dr. Kihlstrom and Dr. Somers had released plaintiff to return to work as of July 1992, plaintiff on the one hand did not think that he was able to work and on the other hand thought that he needed retraining. He was angry with the carrier, his medical care providers and Mr. Seitz for not sending him to school for retraining. Apparently he was accustomed to "calling the shots" and was unwilling to accept or pursue direction from others. At some point he began to take courses at the local community college in computer related subjects because he had decided that that was his best option.
11. In addition to his medical treatment, plaintiff also began receiving psychiatric treatment in February 1992 from Dr. Giduz for symptoms of depression.
12. In the fall of 1992, Mr. Seitz referred plaintiff to several companies which provided security services for businesses in the area. The security guard work was well within his restrictions. The company which provided security to Blue Cross Blue Shield was interested in plaintiff and asked for further follow-up. Although plaintiff returned and provided the crime check form which had been requested, he did not fully complete the employment application and therefore was not considered for employment. He did not follow-up on other job leads provided by Mr. Seitz, made a negative impression on some potential employers, continued to document his contacts poorly and then began to place limitations on the times he was willing to work.
13. In March 1993 plaintiff returned to Dr. Kihlstrom complaining of increased neck and shoulder girdle pain. Dr. Kihlstrom ordered additional diagnostic tests which showed congenital and arthritic changes but no evidence of radiculopathy. He approved several job descriptions submitted by Mr. Seitz, including descriptions for security guards and rental car shuttlers as well as other types of jobs for which openings had been found.
14. Dr. Chavis saw plaintiff that spring and recommended that he have some additional biofeedback and Dr. Kihlstrom concurred. The insurance carrier was asked to authorize the treatment but it did not respond for two months. Consequently, plaintiff began undergoing the treatment with Betty Wolfe in July 1993. The carrier subsequently indicated that it would provide biofeedback but with a different provider. However, Dr. Giduz recommended against changing providers at that point, so plaintiff continued with Ms. Wolfe.
15. Mr. Seitz continued to provide job leads to plaintiff who continued to not pursue them. Consequently, in November 1993 he was asked to suspend his efforts.
16. Although plaintiff has been unable to return to all of his former activities as the owner and manager of defendant-employer, he has been able to work at a medium capacity since July 1992. He was also able to work after January 30 of that year but had to undergo knee surgery in March. Consequently, it would not have been feasible to him to look for other employment at that time. However, as of July 1992 it was incumbent upon him to look for work. By January 11, 1993 when defendants applied for permission to stop payment of compensation, it was clear that he did not intend to return to work. He did not make reasonable efforts to find employment and sabotaged defendants' efforts to help him obtain another job. The Form 24 was improvidently denied.
17. Dr. Giduz' testimony that plaintiff has remained totally disabled has not been accepted as credible. He did not find plaintiff's depression to be disabling but indicated that the pain plaintiff was experiencing was disabling. Dr. Kihlstrom, Dr. Somers and Dr. Goetzl, who treated plaintiff's physical condition, all disagree.
18. Plaintiff reached maximum medical improvement from a physical standpoint by March 18, 1993. He sustained a 5% permanent partial disability to his back and 10% permanent partial disability to his right leg as a result of this injury by accident. His depression resolved as of January 1994. In that Dr. Giduz' opinions regarding plaintiff's physical condition were not accepted, it is very questionable that further treatment by him would tend to effect a cure or give plaintiff relief. Additional treatment by him would not lessen plaintiff's disability.
19. At the hearing before the Deputy Commissioner, plaintiff raised the issue of whether defendants should be required to pay for medical services rendered by Durham-Chapel Hill Orthopaedic Associates and Drs. Dennis, Pact and Lincoln (all other providers having been paid). Dr. Chavis, an authorized treating physician being paid by the carrier, sent plaintiff to Dr. Dennis, an otolaryngologist, in August of 1991, for complaints of chronic neck pain, and Dr. Dennis referred him to Dr. Pact, a neurologist. Dr. Pact evaluated plaintiff, and her referrals for pain management and psychological treatment, including her referral to Dr. Giduz, were reasonably necessary to effect a cure and give relief from the compensable conditions. In October of 1992, Dr. Giduz sent plaintiff to Dr. Lincoln regarding his knee, and Dr. Lincoln referred him for physical therapy to Durham-Chapel Hill Orthopaedic Associates. None of these referrals were specifically pre-authorized by defendants. However, Dr. Dennis was a direct referral from Dr. Chavis, and Dr. Lincoln was referred by Dr. Giduz. The evidence fails to show that defendants requested that authorized doctors obtain prior authorization for referrals or tests per I.C. Rule 407(4), and in fact paid for most of the treatment rendered by referral physicians. When Dr. Lincoln first saw plaintiff in October of 1992, plaintiff had been released to return to work and rated with a 15% disability to the right leg by Dr. Somers. Plaintiff had wanted a second opinion because of the continuing pain in his knee. Dr. Lincoln injected plaintiff's knee, resulting in decreased swelling and improved motion, encouraged plaintiff to continue physical therapy, and continued to see plaintiff for approximately two months until he reached a plateau of improvement. Dr. Lincoln then rated plaintiff with "no more than 5% disability" to the knee. The subject providers' treatment of plaintiff was reasonably necessary to effect a cure, give relief or lessen plaintiff's period of disability. The request to approve them was timely, as defendants were not otherwise providing such treatment.
20. Plaintiff went to an acupuncturist without referral. The treatment was also unauthorized and was rendered a year before he sought approval from the Industrial Commission.
21. Defendants refused to pay for the biofeedback treatment by Ms. Wolfe. In that they waited so long to authorize biofeedback, they placed plaintiff in a difficult position and it was reasonable for him under the circumstances to go to the provider recommended. Since defendants did not otherwise provide the treatment, they should be required to pay for what was given.
* * * * * * * * * * *
Based upon the findings of fact, the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. Plaintiff was entitled to compensation for temporary total disability until January 11, 1993 when defendants applied to stop payment. However, he effectively refused suitable employment by not making a reasonable effort to find employment and by sabotaging defendants' efforts to help him find a different job, and therefore was not entitled to compensation after that date. G.S. § 97-29; G.S. § 97-32; Russell v. Lowe's Products Distribution,108 N.C. App. 762 (1993).
2. Plaintiff is entitled to compensation at the rate of $160.00 per week for 15 weeks for the 5% permanent partial disability he sustained to the back as a result of this injury by accident, but subject to a credit for the compensation he was paid after January 11, 1993. G.S. § 97-31 (23); G.S. § 97-42.
3. Plaintiff is entitled to compensation at the rate of $160.00 per week for 20 weeks for the 10% permanent partial disability he sustained to the leg as a result of this injury by accident, but subject to a credit for the compensation he was paid after January 11, 1993. G.S. § 97-31 (15) and (19); G.S. § 97-42.
4. Plaintiff is entitled to have defendants pay for treatment and services rendered by Dr. Dennis, Dr. Pact and Dr. Lincoln and the physical therapist to whom Dr. Lincoln referred plaintiff, Durham-Chapel Hill Orthopaedics Associates. The services of these providers were reasonably necessary to effect a cure, give relief or lessen the period of disability. N.C.G.S. §§ 97-25 and 97-2(19). Plaintiff was referred by the authorized treating physician, Dr. Chavis, to Dr. Dennis, and there is no persuasive evidence that defendants had requested that Dr. Chavis obtain prior authorization for referrals or tests. I.C. Rule 407(4). Plaintiff was entitled to Dr. Lincoln's second opinion as well as curative treatment at defendants' expense, following the rating and release from treatment of his knee by Dr. Somers, and his rating was found probative in the determination of permanent partial disability. N.C.G.S. § 97-27(b). Plaintiff's request to the Commission that they be approved for payment was timely, in that defendants were not otherwise providing such services.Forrest v. Pitt Co. Bd. of Educ., 100 N.C. App. 119,394 S.E.2d 659 (1990); Davis v. City of Charlotte, I.C. No. 865291, 8 March 1991.
5. Plaintiff is entitled to have defendants provide all medical treatment arising from this injury by accident, including biofeedback treatment by Ms. Wolfe, to the extent it tends to effect a cure, give relief or lessen his disability. G.S. § 97-25
(before amendment).
* * * * * * * * * * *
Based on the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
AWARD
1. In that plaintiff has already received compensation in excess of that to which he is entitled, no further compensation is awarded and defendants are entitled to a credit in the amount of their overpayment.
2. Defendants shall pay all medical expenses incurred by plaintiff as a result of this injury by accident, including those arising from the treatment of Dr. Dennis, Dr. Pact, Dr. Lincoln, and the Durham-Chapel Hill Orthopaedic Associates when bills for the same have been submitted through the defendants to the Industrial Commission and approved by the Commission.
3. An attorney's fee in the amount of $1,400.00 is hereby approved for plaintiff's counsel.
4. Defendants shall pay an expert witness fee in the amount of $160.00 to Dr. Chavis.
5. Defendants shall pay the costs
 S/ __________________ COY M. VANCE COMMISSIONER
CONCURRING:
S/ __________________ J. HOWARD BUNN, JR. CHAIRMAN
S/ __________________ J. RANDOLPH WARD COMMISSIONER
CMV/CNP/tmd 4/17/95; 7/18/94